UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
SUSAN MOSES, on behalf of herself and all others :
similarly situated, :
: MEMORANDUM
Plaintiff, : & ORDER
: 14-CV-3131 (SMG)
-against- :
:
APPLE HOSPITALITY REIT, INC., :
:
Defendant. :
------------------------------------------------------------------- x
GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

Representative plaintiff Susan Moses ("plaintiff" or "Moses") brings this breach of contract action on behalf of participants in defendant Apple Hospitality REIT, Inc.'s ("defendant") Dividend Reinvestment Plans ("DRIPs"). Second Amended Complaint ¶ 1, Docket Entry 21. Plaintiff contends that defendant overvalued DRIP shares, breaching the parties' contract and causing damage to class members by charging inflated prices for the shares they acquired under the DRIPs. *Id.* ¶¶ 4, 12-13.[1]

The parties eventually reached a settlement agreement and moved for preliminary approval of the settlement and preliminary certification of a settlement class. Docket Entry 47. The Court heard oral argument on plaintiff's motion, Docket Entries 53-54, and received revised submissions addressing questions raised at that argument, Docket Entries 60-62. Thereafter, on September 19, 2017, this Court granted plaintiff Susan Moses's motion for preliminary certification of a settlement class and preliminary approval of a class action settlement. *See* Order dated September 19, 2017, Docket Entry 68. The Court's Order also approved the notice

---

[1] The Second Amended Complaint uses the terms "shares" and "units" interchangeably, and this Memorandum and Order does as well.

that the parties proposed to have mailed to class members, as well as a summary notice they proposed for publication. *Id*.

The settlement agreement provides for a $5,500,000 fund from which class members' claims, incentive awards, attorneys' fees, and costs will be paid. Stipulation of Settlement ¶ 4, Docket Entry 63. The net fund, consisting of the portion of the fund remaining after disbursements for incentive awards, attorneys' fees, and costs are made, will be allocated to the class members. *Id.* ¶¶ 4, 1(cc)-(ee). Of the net fund, 85% will be distributed to class members pro rata based on shares purchased during what the parties refer to as the tender offer period for each Real Estate Investment Trust ("REIT"). *Id.* Ex. D. The remaining 15% of the net fund will be distributed in the same manner based on shares purchased outside the tender offer period. *Id.*

The settlement class is defined as follows: "Any person in the United States who participated in the DRIPs for Apple REIT Seven and/or Apple REIT Eight from July 17, 2007 to June 27, 2013 inclusive." *Id.* ¶ 1(e). The class excludes: "(a) Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant; (b) Defendant's legal representatives, predecessors, successors and assigns; and (c) any persons who affirmatively exclude themselves from the Class pursuant to the procedures described in the Class Notice." *Id.* ¶ 1(f).

Interim class counsel engaged a third-party settlement administrator, Kurtzman Carson Consultants LLC ("KCC"). Declaration of Justin Hughes dated December 29, 2017 ("Second Hughes Decl.") ¶ 1, Docket Entry 72. After receiving lists containing the names and addresses of class members, KCC mailed the approved notice to 24,242 class members and re-mailed about five hundred notices that were initially returned as undeliverable. *Id.* ¶ 3. KCC further caused the summary notice approved by the Court to be transmitted over *PR Newswire*, established a

toll-free telephone hotline offering information about the settlement, and created a website with links to the Notice and other key documents relevant to the litigation. *Id.* ¶¶ 5-7. As of December 29, 2017, the telephone hotline had received nine calls and the website had been visited 3,067 times. *Id.* ¶¶ 6-7.

Four class members timely asked to be excluded from the settlement class. Declaration of Justin Hughes dated January 5, 2018 ("Third Hughes Decl.") ¶ 4, Ex. A, Docket Entry 81. The Court received one objection, which is discussed below. Objection of Class Member Dorothy Wenzel ("Objection"), Docket Entry 69.

The parties now seek an Order (1) finally certifying the class for settlement; (2) approving the terms of the revised settlement agreement; (3) approving the plan of allocation; and (4) appointing Moses as class representative and interim class counsel as class counsel. *See* Plaintiff's Memorandum of Law in Support of Final Settlement Approval ("Final Approval Mem.") at 2, Docket Entry 74.

## FACTUAL BACKGROUND

Plaintiff filed a first amended complaint on June 27, 2014, and defendant moved to dismiss. Chief United States District Judge Dora L. Irizarry, to whom this matter was then assigned, granted defendant's motion but afforded plaintiff leave to amend. Memorandum and Order dated March 9, 2015 ("First Order"), Docket Entry 19. Plaintiff then filed a second amended complaint ("SAC"), and defendant again moved to dismiss. Chief Judge Irizarry granted defendant's motion in part, but denied the motion with respect to plaintiff's claim for breach of contract. Memorandum and Order dated September 30, 2016 (" Second Order"), Docket Entry 30.[2]

---

[2] The First Order is published at 2015 WL 1014327 (E.D.N.Y. Mar. 9, 2015), and the Second Order at 2016 WL 8711089 (E.D.N.Y. Sept. 30, 2016).

I assume familiarity with the facts and procedural history of the case set forth in the First Order and Second Order. Accordingly, only those facts that are particularly germane to the motion now before the Court are set forth below.

Plaintiff held shares in defendant's Real Estate Investment Trusts, and purchased additional shares through defendant's DRIPs. Second Order at 2. The terms of the DRIPs, including the means for determining share prices, were set forth in publically filed forms S-3. *Id.* In the First Order, Judge Irizarry found that the S-3s constituted a valid contract between the parties. First Order at 10. The S-3s set forth the means by which the price of shares sold through the DRIPs would be calculated, as follows:

> The price of units purchased under the plan directly from us by dividend reinvestments will be based on the fair market value of our units as of the reinvestment date as determined in good faith by our board of directors from time to time. Our units are not publicly traded; consequently, there is no established public trading market for our units on which we could readily rely in determining fair market value. Nevertheless, the board has determined that, for purposes of this plan, at any given time the most recent price at which an unrelated person has purchased our units represents the fair market value of our units. Consequently, unless and until the board decides to use a different method for determining the fair market value of our units, the per unit price will be determined at all times based on the most recent price at which an unrelated person has purchased our units. Notwithstanding the foregoing, the board of directors may determine a different fair market value and price for our units for purposes of this plan if (1) in the good faith judgment of the board an amount of time has elapsed since our units have been purchased by unrelated persons such that the price paid by such persons would not be indicative of fair value of our units or (2) our board determines that there are other factors relevant to such fair market value.

SAC ¶ 23. The Apple REIT Seven Registration Statement states that "[t]he most recent price paid by an unrelated person for a unit was $11.00 on June 25, 2007. Accordingly, our board of directors has determined that the offering price for units purchased under the plan will initially be $11.00 per unit." Second Order at 10.

Chief Judge Irizarry found these terms in the S-3 to be ambiguous and therefore denied defendant's motion to dismiss:

> The Forms S-3 indicate that the price is "determined at all times based on the most recent price at which an unrelated person has purchased our units." Here, the term "our units" is susceptible to more than one reasonable interpretation because nowhere does this provision or the S-3 define whether "our units" means units purchased directly from the company, or units purchased from third-parties. For instance, the fact that an individual may own A8 units and sell them to a third-party does not make those units any less Defendant's units, or affect Defendant's ability to refer to those units as "our units." As such, this ambiguity presents an issue of fact that cannot be resolved properly at this stage of the litigation.

Second Order at 11.

Plaintiff's sole remaining claim is that defendant is liable for breach of contract for failing to determine the prices of DRIP shares in the manner required by the terms of the S-3s. As indicated above, the Apple REIT Seven S-3 disclosed that the most recent price paid by an unrelated person for a unit was $11.00; based on this sale, defendant consistently priced shares at $11 per unit throughout the class period. Mem. in Supp. of Pl.'s Mot. For Final Approval ("Final Approval Mem.") at 3, Docket Entry 74. Plaintiff contends that the $11.00 share price was artificial and did not reflect the most recent price at which a share was purchased by an unrelated person or a fair value determined in good faith by defendant. As a result, plaintiff argues, DRIP participants received fewer shares than they would have if the shares had been properly priced. Final Approval Mem. at 3.

As noted above, 85% of the net settlement proceeds are allocated to DRIP shares purchased during a tender offer period and 15% are allocated to shared purchased before and after the tender offer period. Final Approval Mem. at 4. The basis for this allocation is that bidders paid between $3.00 and $5.50 per share during the tender offer period. SAC ¶ 29; Plaintiff's Amended Memorandum in Support of Preliminary Approval at 21 ("Pl. Am. Mem."),

5

Docket Entry 61; Declaration of William Jeffers ("Jeffers Decl.") ¶ 10, Docket Entry 80. Plaintiff contends that these sales provide more compelling evidence that the $11.00 share price was higher than fair market value during the tender offer period than is available for the times before and after the tender offers were made. More specifically, proving damages for the periods before and after the tender offers would require evidence of prices paid for shares in a limited secondary market or proof that defendant acted in bad faith. Pl. Am. Mem. at 21.

Despite evidence of substantially lower unit prices paid through the tender offers, even the settlement amount allocated to the tender offer period reflects only a small percentage of the damages that would be available if prices for the DRIP shares mirrored or approached the tender offer prices. Plaintiff has submitted a declaration of an expert in business valuation who estimated the potential recoverable damages in that action as ranging from $22.1 million to $40.6 million, or approximately four to eight times the total amount of the parties' settlement. Jeffers Decl. ¶ 4.

Plaintiff explains the steep discount she asks the Court to approve by stressing the litigation risk the class would face if it proceeded with litigation. Plaintiff points out, for example, that even during the tender offer period, there may have been other prices paid by unrelated persons closer to or even equal to $11.00 per share. Such purchases would have the effect of resetting the share price for the DRIPs pursuant to the "most recent price" clause of the S-3s. Moreover, as reflected in the excerpt of the Second Order quoted above, Chief Judge Irizarry determined that it was unclear whether shares acquired from existing shareholders and not directly from the company itself even bear upon the pricing formula set forth in the S-3s. Indeed, revised language in the S-3s applicable to the period after the tender offers expressly provides that prices for DRIP shares will be determined by the most recent price at which an

unrelated person purchased shares from defendant. Pl. Am. Mem. at 21. Thus, plaintiffs contend, damages would be quite uncertain even if liability were established.

## DISCUSSION

### I. Class Action Certification

"Before certification is proper for any purpose—settlement, litigation, or otherwise—a court must ensure that the requirements of Rule 23(a) and (b) have been met." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)) ("[C]ertification is proper only if 'the trial court is satisfied . . . that the prerequisites of Rule 23(a) have been satisfied.'"). Moreover, these requirements "should not be watered down by virtue of the fact that the settlement is fair or equitable." *Denney*, 443 F.3d at 270.

*A. Rule 23(a) Requirements*

Rule 23(a) sets out four prerequisites for certifying a class action. A suit may be maintained as a class action only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)

Numerosity is presumed met when a putative class contains at least forty members. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Marin v. Apple-Metro, Inc.*, 2017 WL 4950009, at *40 (E.D.N.Y. Oct. 4, 2017). The class here far exceeds this threshold. Not only does plaintiff report that the class "is larger than 10,000 members," but in addition, the settlement administrator distributed notices to 24,242 potential class members. Final Approval Mem. at 21; Second Hughes Decl. ¶ 3.

7

Rule 23(a)(2) requires that the claims asserted on behalf of class members share a common question, such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. A single common question will do. *Id.* at 359. As described above, the central issues to be determined in this case are what method for pricing DRIP shares the S-3s require and whether defendant followed that method properly. The interpretation of the pricing provision in the S-3s applies with equal force to the shares of all class members. Because the same contract existed between defendant and each class member, a resolution of the contract's meaning as to one unit holder would resolve the meaning of the contract as to all. Similarly, the same method of calculating the price dictated by the terms of the S-3s would apply to all shareholders, particularly because the investment at issue was typically held over a substantial period of time. Transcript of July 7, 2017 Preliminary Approval Motion Hearing ("Prelim. Approval Tr.") 6:21-7:23, Docket Entry 54. Thus, most class members are likely to have had dividends reinvested to purchase additional shares at various times during the class period. Any unique circumstances that might drive the determination of the DRIP share price at a particular moment in time would thus apply to most class members, regardless of when they acquired their shares. Accordingly, Rule 23(a)(2)'s requirement of commonality is met in this case.

A representative party's claims are typical of the class where her claims arise "from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Marin*, 2017 WL 4950009, at *45 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig. (Flag Telecom)*, 574 F.3d 29, 35 (2d Cir. 2009). Because Moses's contracts with defendant—the S-3s—are the same contracts on which every other class member's claim would be premised, her claim is typical of the claims of the class.

Finally, under Rule 23(a)(4), a representative party must adequately protect the interest of the class. A representative plaintiff is an adequate class representative when (1) that plaintiff's interests are not antagonistic to the other class members, and (2) that plaintiff is represented by qualified, experienced attorneys. *See Flag Telecom*, 574 F.3d at 35; *Melito v. American Eagle Outfitters, Inc.*, 2017 WL 3995619, at *8 (S.D.N.Y. Sept. 11, 2007). Because the representative plaintiff's claim and anticipated recovery are the same as the other class members in this action, her interest in its outcome is not antagonistic to theirs. Moreover, proposed class counsel have submitted declarations which indicate that they are experienced in class action litigation, and in federal securities litigation in particular. *See* Declaration of Jeffrey Salas ("Salas Decl."), Ex. A, Docket Entry 76; Declaration of James Eccleston ("Eccleston Decl."), Ex. A, Docket Entry 77; Declaration of Christopher Gray dated December 29, 2017 ("Second Gray Decl."), Ex. 1, Docket Entry 78.

For the foregoing reasons the Court concludes that the certification requirements of Rule 23(a) are met in this case.

*B. Rule 23(b) Requirements*

In addition to the requirements set out in Rule 23(a), a class must be appropriate under one of the provisions of Rule 23(b). In this case, plaintiff contends that the proposed class meets the requirements of Rule 23(b)(3), which provides for certification if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The predominance question raised by Rule 23(b)(3) asks "whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-defeating, individual issues." *In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir. 2017) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)) (emphasis in original). This test is met where "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016). Moreover, a class action is superior to other methods of adjudicating a controversy where "substituting a single class action for numerous trials . . . will achieve significant economies of time, effort and expense, and promote uniformity of decision." *Melito*, 2017 WL 3995619, at *9 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013)).

As noted above, Judge Irizarry has already decided that the S-3s constituted a contract between defendant and each class member. The remaining claim in this action is for breach of that contract, and proof of that breach as to any one plaintiff would demonstrate breach as to all class members. Any differences among class members would likely be limited damages, which presumably would be calculated based upon how many units a particular class member acquired through the DRIP and when the acquisitions took place. These differences are far less prevalent or important than the issues class members have in common. Moreover, individual trials would be far less efficient than a class action, and might well lead to inconsistent results. Accordingly, questions common to class members predominate over any individual questions, and a Rule 23

class action is superior in this case to other forms of adjudication. The requirements of Rule 23(b) are thus satisfied as well.

## II. Fairness and Adequacy of the Settlement

A court may approve a class action settlement only upon a finding that the settlement is both procedurally and substantively fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2); *see also McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)) (outlining factors for courts to consider in determining the substantive fairness of proposed settlements).

### A. Procedural Fairness

There is "a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *McReynolds*, 588 F.3d at 803 (internal quotation marks omitted). Moreover, there is a "strong judicial policy" and public policy in favor of class settlements. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005). Thus, while "[t]he Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Grinnell*, 495 F.2d at 462.

The parties in this case engaged in some discovery, limited to a production of documents by defendant and David Lerner Associates, the sole managing dealer for the offerings in question. Pl. Am. Mem. at 1; Declaration of Christopher Gray ("First Gray Decl.") ¶ 15, Docket Entry 73; Final Approval Mem. at 4. Further, the settlement in this case was negotiated by experienced counsel with substantial background in similar litigation. *See* Salas Decl., Ex. A;

11

Eccleston Decl., Ex. A; Second Gray Del., Ex. 1. The settlement was reached after the parties engaged in an entire day of mediation before the Honorable Theodore H. Katz, Retired United States Magistrate Judge. Final Approval Mem. at 4. Under these circumstances, I conclude that the settlement is entitled to a presumption of fairness.

   B. *Substantive Fairness*

A court determines whether a proposed settlement is substantively fair by considering the following *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*McReynolds*, 588 F.3d at 804 (citing *Grinnell*, 495 F.2d at 463 (internal citations omitted)); *see also Wal-Mart Stores*, 396 F.3d at 118-19 (combining the fourth, fifth and sixth factors and combining the eighth and ninth factors); *In re Elec. Books Antitrust Litig.*, 639 F. App'x 724, 727 (2d Cir. 2016) ("[E]valuation of the fairness and adequacy of every settlement requires a court to assess the likely outcome of future legal proceedings, namely, the relative probabilities of various outcomes if there were no settlement and the parties went to trial.") (emphasis omitted); *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) ("[T]he court should consider the totality of these factors in light of the particular circumstances.").

A majority of the *Grinnell* factors weigh heavily in favor of approving the settlement in this case. The reaction of the class to the settlement is particularly significant here. This settlement concerns 20.8 million of defendant's unredeemed shares. *See* Declaration of Justin Hughes dated August 21, 2017 ("First Hughes Decl.") ¶¶ 4-5, Docket Entry 62. The Claims administrator sent a

total of 24,767 notices to class members. Third Hughes Decl. ¶ 2. The notices explained the settlement and the timing of the fairness hearing, as well as procedures for objecting or excluding oneself from the settlement. The Court has received just one objection from the holder of at most, seven hundred shares. *Id.* ¶ 3; Transcript of January 16, 2018 Fairness Hearing ("Fairness Tr.") 4:17-5:14, Docket Entry 84. Only four potential class members chose to exclude themselves. Third Hughes Decl. ¶¶ 3-4.

A very low number of objections and exclusions ordinarily evinces a class's tacit acceptance of a settlement. *See In re Elec. Books Antitrust Litig.*, 639 F. App'x at 727 (approving of the trial court's conclusion that "the class implicitly approved the settlement" where there were "few exclusions and few objections"). The few exclusions and lone objection in this case recommend final approval even more strongly than they might in another case because the settlement concerns complex financial instruments held by sophisticated investors who were largely assisted by advisors. *See* Fairness Tr. 23:13-14. In this context, the class's reaction to the settlement strongly favors final approval.

Moreover, many of the remaining factors also counsel approval of this settlement. The case is complex and would be costly to bring to trial. Proving damages in this case depends, in part, on determining whether defendant's board acted in good faith. In addition, if defendant produced evidence of third-party sales of REIT shares at prices that approached or equaled $11.00 per share, plaintiff's damages theory would be substantially or entirely undermined. Finally, to make use of the tender offer evidence or other evidence of purchases from third parties, the class would have to prevail on their reading of the term "our units" as used in the S-3s, and defeat defendant's argument that the only prices relevant to DRIP shares are those that were paid to acquire units directly from defendant. As noted above, Chief Judge Irizarry has

13

already determined that defendant's reading is a "reasonable interpretation" of the terms of the S-3s. Second Order at 11.

*C. Wenzel's Objection*

The sole objector in this case, Dorothy Wenzel, argues primarily that the settlement fund inadequately reflects the recovery that would be available if the class were to succeed at trial. More specifically, at the fairness hearing held on January 16, 2018, objector presented her own calculation of damages based on different sources for the data used to determine fair market value of the DRIP shares. Fairness Tr. 15:22-16:13. Based on her own experts' analysis, as well as some of plaintiff's early estimates, objector argues that plaintiff could potentially prove damages in excess of $80 million. *Id.* at 16:23-17:1. Moreover, objector contends that plaintiff's case is bolstered by Judge Irizarry's earlier opinion denying defendant's motion to dismiss, arguing that "the judge is basically conceding that they're going to see a jury on [the contract's interpretation]." Fairness Tr. at 9:4-5.

As noted above, while a court must conduct an independent evaluation of the fairness of a proposed class action settlement, "it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Grinnell*, 495 F.2d at 462. This Court's view is that Wenzel's objection underestimates the degree of risk plaintiffs would face if they proceeded to trial. Indeed, objector previously brought her own suit asserting, among other causes of action, breach of contract based on the same S-3s at issue in this suit. *Wenzel v. Knight*, 2015 WL 3466863, at *4 (E.D. Va. June 1, 2015). The judge in that action dismissed Wenzel's breach of contract claim, concluding that her position was "not supported by any contractual language . . . . The defendants priced the DRIP units precisely in the manner contemplated by the Form S-3 and, therefore, did not breach the agreement." *Id.* at *7. Moreover, although objector

correctly notes that Chief Judge Irizarry identified a question of fact with regard to the interpretation of the S-3s at issue, one "reasonable interpretation" noted by Judge Irizarry would undermine plaintiff's theory of breach and lead to judgment for defendant. Second Opinion at 10-11.

In short, the litigation risk here is significant. Two courts have already considered breach of contract claims arising out of the S-3s at issue in this case. The first dismissed the claim altogether, and the second held that the S-3s are susceptible to an interpretation that would be fatal plaintiff's case. Although those rulings do not foreclose the possibility that plaintiffs would succeed in this case, they lend support to plaintiff's evaluation of the severity of the litigation risk. In addition, as noted above, if defendant can produce evidence of sales above the tender offer price, those sales would reset "the most recent price at which an unrelated person has purchased . . . units" to a higher one, lowering or eliminating the damages the class could claim. Fairness Tr. at 26:8-11. Even assuming objector's theory of damages to be correct, the serious litigation risks outlined above justify settlement at a price that reflects plaintiff's assessment of the case.

### III. Attorneys' Fees, Service Awards, and Costs

*A. Attorneys' Fees*

A Court's discretion in assessing an application for attorneys' fees in this context is guided by six non-exclusive factors: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *In re Tremont Sec. Law, State Law & Ins. Litig.*, 699 F. App'x 8, 16 (2d Cir. 2017) (quoting *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000)). Moreover, "both the lodestar and the percentage of the fund methods are available to district judges in

calculating attorneys' fees in common fund cases." *Goldberger*, 209 F.3d at 50. The trend, however, is to award a percentage, because doing so "better aligns the incentives of plaintiffs' counsel with those of the class members." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014).

Counsel in this case request an award of one third of the settlement fund for attorneys' fees, for a total of $1,833,333.33. Plaintiff's Memorandum in Support of Fee Application ("Fees Mem.") at 1, Docket Entry 75. A fee award of one third of the settlement fund here is consistent with awards in other settlement fund cases in this District. *See, e.g.*, *Karic v. Major Auto. Companies, Inc.*, 2016 WL 1745037, at *8 (E.D.N.Y. Apr. 27, 2016) (collecting cases and noting that "Courts in this Circuit have often approved requests for attorneys' fees amounting to 33.3% of a settlement fund."); *In re Payment Card Interchange Fee*, 991 F. Supp. 2d at 445 (awarding 33% of first $10 million recovered in settlement); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (noting that a fee award equal to 33% of a settlement fund is "reasonable and consistent with the norms of class litigation in this circuit." (internal quotation marks and citation omitted)).

Although a Court may assess the reasonableness of a fee application on a percentage basis, "the lodestar remains useful as a . . . 'cross check' on the reasonableness of the requested percentage." *Goldberger*, 209 F.3d at 50. Counsel in this case have submitted billing records which establish that the fees they seek to recover equal approximately 2.13 times their lodestar calculation. Fees Mem. at 11-12 (reporting a lodestar calculation of $859,768 which, if $1,833,333 were awarded in fees, would result in a multiplier of 2.13).

In absolute terms, a lodestar multiplier of 2.13 approaches the range that has been considered excessive by courts in this Circuit. *See, e.g.*, *In re Tremont Sec. Law, State Law & Ins.*

16

*Litig.*, 699 F. App'x at 18 ("A lodestar multiplier of 2.5 would be considered high for a standard common fund case in this Circuit."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 WL 313474, at *23 (S.D.N.Y. Feb. 1, 2007) ("[A]n award that equates to a multiplier of 2.43 of the lodestar is excessive."); *In re Twinlab Corp. Sec. Litig.*, 187 F. Supp. 2d 80, 87 (E.D.N.Y. 2002) ("[P]ost-*Goldberger* courts which have generally refused multipliers as high as 2.03.").

At the same time, numerous exceptions demonstrate that slightly higher multipliers may be approved consistently with *Goldberger*. *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 401 (S.D.N.Y. 2013) ("[A] 2.8 multiplier . . . is high but not excessive."); *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) ("[T]he requested 2.16 multiplier falls comfortably within the range of lodestar multipliers and implied lodestar multipliers used for cross-check purposes in common fund cases in the Southern District of New York."). Higher multipliers are justified where attorneys face a significant risk that their case may not succeed. *In re Tremont Sec. Law, State Law & Ins. Litig.*, 699 F. App'x at 17 ("[C]ontingency risk . . . is generally the most important in determining whether to award a lodestar multiplier."); *Goldberger*, 209 F.3d at 54 ("We have historically labeled the risk of success as perhaps the foremost factor to be considered in determining whether to award an enhancement." (internal quotation and citation omitted)).

Whether evaluated as a percentage of the settlement fund or in light of the lodestar multiplier that would result, the fees sought by counsel in this case are excessive. As discussed above, the results obtained by counsel on behalf of the class—a total settlement fund of $5.5 million in the face of damages estimates by plaintiff's expert ranging from $22.1 million to $40.6 million, and by objector's expert ranging up to $80 million and above—are, at best, modest.

Moreover, the lodestar multiplier—already high—would be even higher if it were calculated based upon more reasonable hourly rates. Plaintiff's most senior attorneys calculate their lodestar based upon hourly rates of $500 for Mr. Salas, $600 for Mr. Eccleston, and $585 for Mr. Gray. Salas Decl. ¶ 6; Eccleston Decl. ¶ 7; Second Gray Decl. ¶ 6. In contrast, Eastern District cases awarding attorney's fees have concluded that the "prevailing rates for experienced attorneys [in this District] range from approximately $300-400 per hour." *Konits v. Karahalis*, 409 F. App'x 418, 422 (2d Cir. 2011) (citation omitted); *see also D'Annunzio v. Ayken, Inc.*, 2015 WL 5308094, at *4 (E.D.N.Y. Sept. 10, 2015) ("Courts in the Eastern District of New York award hourly rates ranging from $200 to $450 per hour for partners" and "$100 to $300 per hour for associates."); *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 261 (E.D.N.Y. 2014) ("Recent opinions issued by courts within the Eastern District of New York have found reasonable hourly rates to be approximately $300-$450 for partners, $200-$325 for senior associates, and $100-$200 for junior associates."). While some upward variation from the norm might be justified in light of the complexity of a securities class action litigation like this one, the hourly rates remain high.

Taking into account the modest degree of success achieved and the high lodestar multiplier, plaintiff's attorneys are awarded 25% of the settlement fund, or $1,375,000. Even at the somewhat high hourly rates charged by counsel, this amount results in a multiplier of 1.6, more than adequate to reasonably compensate counsel in this case and incentivize attorneys to take on lawsuits like this one. The difference between the 33% sought and the 25% awarded shall, of course, be added to the net settlement fund.

### B. Costs and Service Award

In addition to their fees, counsel seek a service award of $10,000 for representative plaintiff Susan Moses. Similar amounts have been approved as reasonable. *See, e.g.*, *Karic*, 2016 WL 1745037 at *8 (awarding $20,000 each to named plaintiffs from a $5.5M fund). According to plaintiff's counsel, Moses "actively and effectively fulfilled her obligations as a representative of the Class, complying with all of the demands and requirements placed upon her and providing Lead Counsel with valuable assistance." Fees Mem. at 24. Accordingly, the $10,000 service award requested is approved.

Finally, counsel seek litigation expenses totaling $24,844.66. "It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses." *Karic*, 2016 WL 1745037, at *9 (quoting *In re Marsh ERISA Litig*, 265 F.R.D. 128, 150 (S.D.N.Y.2010); *see also In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *11 (E.D.N.Y. Oct. 23, 2012) (reimbursing class counsel for "expert witness costs, deposition reporters and transcripts, translation and review of Chinese-language documents, copying, travel, research, and court-filings"). The expenses for which Counsel seek reimbursement include, among others, expert witness fees, mediation fees, and computerized legal research fees. Fees Mem. at 23. The costs described by Counsel are necessary and incidental to their representation of the class, and I find them to be reasonable. The amount sought is accordingly awarded as well.

## CONCLUSION

For the reasons described above, plaintiff's motion is granted. Specifically, the Court orders that:

a. Final certification is granted to the class described herein for purposes of settlement;

b. The Settlement Agreement, including its proposed plan of allocation, is approved;

c. The law firms of Salas Wang LLC, Eccleston Law, LLC, and Law Office of Christopher J. Gray, P.C. are appointed Class Counsel;

d. Class counsel are awarded attorneys' fees equaling 25% of the Settlement fund, or $1,375,000;

e. Class counsel's request for reimbursement of $24,844.66 of litigation expenses is approved; and

f. Susan Moses is appointed class representative and granted a $10,000 service award.

SO ORDERED.
/s/
_____
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
March 27, 2018

*U:\#DJM 2017-2018\Moses v. Apple Hospitality REIT, Inc. et al. 14-cv-3131 (DLI)\Final Approval\Final Approval Order - FINAL.docx*